UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. DIMITROULEAS/SNOW UNITED

STATES OF AMERICA

v.

DR. JOSE SANTEIRO,

    Defendant.
_____/

## DR. SANTEIRO'S SUPPLEMENTAL SENTENCING MEMORANDUM

Dr. Santeiro submits this supplement to his original sentencing memorandum to respond, in part, to the government's sentencing memorandum [D.E. 738] and sentencing proposal.

This case, and Dr. Santeiro's individual culpability, has gone from generally being an absent physician and medical director, who should have retired, to: "Dr. Santeiro therefore caused even more financial loss, and committed fraud more pervasively, than did even Jonathan Markovich" [D.E. 738 at p. 2] and "There is no escaping the fact that Dr. Santeiro's conduct was more expansive, and resulted in greater loss, than any other defendant in this case." [D.E. 738 at p. 9].

The government's purported "limited "use of 404(b) extrinsic evidence relating to Florida Life and Future Now, for the purpose of proving intent has now (at

1

sentencing as it did at trial) taken on a life of its own, becoming not just a feature in this case, but the main attraction. The government devotes five pages – the most specific, heavily-cited five pages -- of its sentencing memorandum to Florida Life and Future Now. [D.E.738 at pp. 4-9]. Florida Life and Future have gone extrinsic matters, used to prove intent, based on "trends" the government's "summary witness" observed in "samples of patient files" to: "Dr. Santeiro Committed Health Care Fraud at Florida Life and Future Now." [D.E. 738 at 4]. It is therefore unsurprising (but still shocking) that the *primary* driver of the government's proposed loss calculation as to Dr. Santiero are Florida Life and Future Now. [D.E. 738 at pp. 8-9].

The governments arguments about the evidence, the sentencing guidelines and Dr. Santeiro's individual culpability are at best speculative and unsupported by the record.

Whatever the jury verdict means, the verdict is not an authorization to indiscriminately apply the sentencing guidelines, the verdict is not an invitation to abdicate the *individualized* application of the sentencing factors in 18 U.S.C. § 3553, and the verdict does not absolve the government of its burden of proof at sentencing.

While the government's burden is measured against a preponderance standard, the Court must ensure that the government carries this burden by presenting reliable and specific evidence. *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir.1995). And despite what the government's sentencing memorandum might suggest, this is a

real burden, which the Eleventh Circuit has described by pointing to the following description:

> Although not as rigorous as the reasonable doubt or clear and convincing standards, the preponderance standard is not toothless. It is the district court's duty to ensure that the Government carries this burden by presenting reliable and specific evidence. As one of our sister circuits noted: [T]he Guidelines do not reduce district court judges to mere automatons, passive compilers of ciphers, or credulous naifs who must accept as canon all that which is presented to them regarding a defendant's involvement in the crime charged or conduct relevant thereto.... [T]he preponderance of the evidence standard ... does not relieve the sentencing court of the duty of exercising the critical factfinding function that has always been inherent in the sentencing process.... [The standard signifies] a recognition of the fact that if the probation officer and the prosecutor believe that the circumstances of the offense, the defendant's role in the offense, or other pertinent aggravating circumstances, merit a lengthier sentence, they must be prepared to establish that pertinent information by evidence adequate to satisfy the judicial skepticism aroused by the lengthier sentence that the proffered information would require the district court to impose.

*Lawrence*, 47 F.3d 1559, 1566–67 (11th Cir. 1995)(*citing United States v. Wise,* 976 F.2d 393, 402-03 *(*8th Cir. 1992*),cert. denied,*___ U.S. ___, 113 S.Ct. 1592, 123 L.Ed.2d 157 (1993) .

For example, regarding loss, the Eleventh Circuit outlined the government's obligation as follows:

> The government bears the burden of proving by a preponderance of the evidence actual loss attributable to the defendant's conduct. *United States v. Rodriguez,* 751 F.3d 1244, 1255 (11th Cir. 2014). "[A] sentencing court is not generally required to make detailed findings of individualized losses to each victim." *United States v. Orton,* 73 F.3d 331, 335 (11th Cir. 1996) (considering the similar predecessor guideline, U.S.S.G. § 2F1.1 ). Instead, the court may employ a variety of methods to derive a "reasonable estimate of the loss" to the victims based on the information available to

the district court. *United States v. Snyder,* 291 F.3d 1291, 1295 (11th Cir. 2002) ; *accord United States v. Ford* , 784 F.3d 1386, 1396 (11th Cir. 2015) ; *see also* U.S.S.G. § 2B1.1 cmt. n.3(C)(iv) (providing that district courts should "tak[e] into account, as appropriate and practical under the circumstances," a variety of factors including the "approximate number of victims multiplied by the average loss to each victim"). Although the district court may estimate the amount of loss, it cannot "speculate about the existence of facts and must base its estimate on reliable and specific evidence." *Ford,* 784 F.3d at 1396 ; *accord United States v. Sepulveda* , 115 F.3d 882, 890-91 (11th Cir. 1997).

*United States v. Stein*, 846 F.3d 1135, 1152 (11th Cir. 2017).

In *Stein*, a securities fraud case, the Eleventh Circuit reversed for resentencing because the Court did not require the government to prove, with specificity, facts that affected the defendant's loss calculation. *Id.* at 1156. In reaching this conclusion, the court went through an extensive analysis of loss determination, setting forth a two-part inquiry, consisting of factual causation and legal causation. *Id.* at 1153-55. The court held that the government had failed to prove the loss amount under both types of causation. *Id.*

The *Stein* case is instructive because, the government in *Stein* argued that the loss calculation should encompass 2,415 investors that lost money, without regard to whether the investors actually relied on the defendant's misrepresentation and without regard to whether intervening events lowered the defendant's loss amount. *Id.*

As to investor reliance, the *Stein* court held that the testimony, victim impact statements and testimony that the only source for stock information was public filings,

4

was "insufficient to support the inference that *all* 2,415 investors relied on Mr. Stein's fraudulent information when deciding to purchase Signalife stock." *Id.* at 1154. The court went on to note that "on this thin record, the district court '"engage[d] in the kind of speculation forbidden by the Sentencing Guidelines."' *Id.* (citations omitted).

As to intervening events, the court in *Stein* held that sentencing court failed to consider whether the stock decline that the defendant argued was attributable to short-selling and a general market decline were unforeseeable and should result in a lower loss amount. *Id.* at 1155-56. The Court noted that "[o]nce Mr. Stein pointed to intervening events that may have affected the stock price, the district court was obliged to make findings regarding the effects of these intervening events, if any, and whether these events were reasonably foreseeable to Mr. Stein." *Id.* at 1156.

The reasoning in *Stein* translates directly to a rejection of the indiscriminate loss amount arguments advanced by the government as to Dr. Santeiro. This Court has obviously recognized the flaw in the government's view of the evidence and loss calculations, by rejecting and reducing the government's loss proposals as to every other defendant to be sentenced in this matter. The Court has reduced the loss amount to 10% of what the government has proposed for every other defendant

However, consistent with the applicable law, and contrary to what the government takes as a given, the Court should "discount" – to use the government's word – Dr. Santeiro's loss amount as to Compass and War ***more so*** than any other

5

defendant. While the reasoning behind the "discounts" applied to other defendants equally applies to Dr. Santeiro, the evidence at trial established that Dr. Santeiro was never told and had no way of knowing or foreseeing what the defendants that received the 90% discount were doing because they were actively lying to him on almost every front.

Take Dr. Lieberman, for example: The government outlandishly still claims that Dr. Santeiro "allowed" Dr. Lieberman to use his credentials and that this was a "blank check", when the testimony at trial ***by Dr. Lieberman*** was that Dr. Lieberman – a highly regarded and credentialed physician – was impersonating Dr. Santeiro in the medical records software, was actively involved in sedating patients with the comfort drink, discussed the need and desire to increase patient numbers with co-conspirators, was physically at Compass to see what was going on, all the while understanding that Dr. Santiero trusted Lieberman's judgment because Santeiro told Lieberman as much. Dr. Lieberman also testified that Miami's most respected and responsible physicians had relied on Dr. Lieberman for decades and that those physicians reasonably relied on him based on his reputation and experience, and because he gave them no reason to distrust him. This is no less applicable to Dr. Santeiro. Additionally, there was zero evidence presented by the government, either through witness testimony or written communication, regarding conversations with Dr. Santeiro permitting the improper use of his credentials.

Add to this, the testimony that established the secret kick back agreement between Garnto and Markovich, which was kept from Santeiro. Add to this, the testimony that Garnto and others were actively getting patients high to qualify for treatment and paying the patients, which was also kept from Santeiro. Add to this, the evidence established laboratory testing ordered in the name of Dr. Santiero, but in reality, auto-generated by the software using an IP address of 0.0.0.

These lies, all of which the government has acknowledged, are the kind of "intervening events" discussed in *Stein* and which were not foreseeable to Dr. Santeiro under any of the government's evolving theories. This begs the question: How much of the 10% loss should be attributable to Dr Santeiro when that 10% has been applied to demonstrably – as in there is actual evidence of it – more culpable defendants, who were intricately aware of the scope of the fraud and actively kept Dr. Santeiro in the dark? Can that subset be established or determined with any specificity or reliability, if we accept for the sake of argument, that Dr. Santeiro was convicted of falling asleep at the wheel?

As the Court is surely aware, if the district court determines that the loss "reasonably cannot be determined," the court may use instead "the gain that resulted from the offense.". *United States v. Stein*, 846 F.3d at 1154. (citing to §2B1.1 cmt. n.3(B)). As the Court is also aware, Dr. Santeiro made $267,041 from Compass/War.

Florida Life and Future now are not relevant conduct just because the

government calls it fraud. And because overstatement and exaggeration have been the constant in this case, it's not enough to call it fraud. Nope, it's **all** fraud. And as such, just because the government says so, it should be included in the loss amount and indeed turn out to be the largest loss amount in the case. To call this all speculative almost dignifies the argument.

The actual, provable loss at Compass and War, which were the subject of two multi-week trials, saw the testimony of a parade of witnesses, some of whom were cooperators that admitted to and described the fraud was reduced by ***90%*** to arrive at what this Court felt was the best estimate of the actual loss. Florida Life and Future Now, on the other hand, were the subject of a "summary" witness who backed handpicked, theory-driven numbers into a chart to identify "trends." [D.E. 738 at p. 5]. That Florida Life or Future Now are wholesale frauds, resulting in some loss attributable to Dr. Santeiro, is more than just speculative, its imagined. It has not been proven by any quantum of proof, much less a preponderance standard. It is not supported by any reliable or specific. Frankly, it has all been just argued into existence by the government.

Therefore, to hold Dr. Santeiro accountable for a single dollar of this imaginary loss would, to understate it, "engage in the kind of speculation forbidden by the Sentencing Guidelines." *United States v. Bradley,* 644 F.3d 1213, 1292 (11th Cir. 2011). To do so, would also violate Dr. Santeiro's Sixth Amendment rights, including

the constitutional right as set forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

Whatever this Court decides the guidelines are, it is well established that a sentencing court "may not presume that the Guideline range is reasonable, but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). The *Gall* Court specifically rejected the use of rigid mathematical formulas to determine whether a variance from the Guidelines' sentence range is justified. *Id*. at 47. The Court also rejected the idea that "extraordinary circumstances" are required to justify a sentence outside the Guidelines' advisory range. *Id*.

Thus, as the Court considers what constitutes a reasonable sentence and how the § 3553(a) factors weigh as to Dr. Santeiro, we urge the Court to reject the government's dystopian argument on the facts of the case, the sentencing guidelines and Dr. Santeiro's individual culpability.

The United States Supreme Court has clearly established that our sentencing regime is set up to do quite the opposite of what government appears to suggest, and that is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue," *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted); and, as such, that "the punishment should fit the offender not merely the crime." *Id.*

Respectfully submitted,

**BEATON LAW FIRM PA**
12925 SW 132nd Street, Ste 4
Miami, Florida 33186
Tel: (305) 378-5950
E-mail: mbeaton@beatonlawfirm.com

*/s/ Marcos Beaton Jr.*
**Marcos Beaton, Jr.**
Florida Bar No. 0573787
*Counsel for Dr. Jose Santeiro*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document was filed via the Court's CM/ECF system on June 6, 2022 and electronically served on the parties included on the service list.

*/s/ Marcos Beaton Jr.*
Marcos Beaton Jr.